## WILLYS–OVERLAND MOTORS, Inc., v. KRENZ.

### No. 10460.

Circuit Court of Appeals, Sixth Circuit.

Dec. 1, 1947.

Milton Boesel, of Toledo, Ohio, (Ritter & Boesel, of Toledo, Ohio, on the brief; Milton C. Boesel, of Toledo, Ohio, of Counsel), for appellant.

Wilson W. Snyder, of Toledo, Ohio, (Welles, Kelsey, Fuller, Coburn & Harrington, of Toledo Ohio, on the brief; Wilson W. Snyder, of Toledo, Ohio, of counsel), for appellee.

Before SIMONS, McALLISTER, and MILLER, CIRCUIT Judges.

McALLISTER, Circuit Judge.

In November, 1944, the Willys-Overland Company was interested in building an incinerator on its premises in Toledo, Ohio, for the purpose of disposing of rubbish from its manufacturing plant. Appellee was engaged in the business of constructing such incinerators, and, upon the request of the Engineering Department of Willys-Overland, called and discussed the matter. In the course of his conversation, he mentioned an incinerator he had constructed at Fremont, Ohio, and representatives of the company afterward inspected this example of his work. On another meeting with them, appellee received an idea of the type of construction they wanted, and was asked to prepare a plan and drawings representing what they had described to him. He had such plans prepared, and after numerous conferences with members of the Engineering Department, and after many alterations in the original plans, appellee, on February 6, 1945, delivered in person to the proper officials of the Engineering Department, blueprints, specifications, and a bid to construct and erect an incinerator and furnish all labor and materials for such work. In order to burn the required amount of 5,000 pounds of mixed rubbish per hour and to do it by a method that was smokeless, odorless, and sparkless, the incinerator had to be approximately 23 feet in length, 16 feet in width, and 11 feet in height, with a smokestack 70 feet high. Appellee's bid was in the amount of $20,900. Not receiving a reply to the offer, appellee got in touch with the Engineering Department about ten days after he had submitted his offer, and was told that everything was then in the hands of the Purchasing Department. He then called upon the Chief Purchasing Agent and was referred to the Assistant Purchasing Agent, Edellstein, who, he was told, was in full charge of the incinerator project. Edellstein informed him that nothing had yet been decided upon but that by the end of that week, the contract would be awarded to one of the bidders. Some days later, Edellstein called appellee by telephone and the conversation that took place between them forms the main basis for this controversy.

Appellee claims that his written offer was orally accepted by the company in the above conversation on February 24, 1945, and became a binding contract. The Willys-Overland Company contends that the offer was

not accepted, but that it was the understanding that further terms were to be included in the contract, and that inasmuch as such terms were never agreed upon, no contract resulted, appellee's offer was not accepted, and no binding agreement ever took place between the parties. A contract to construct the incinerator was awarded by the company to someone else, and appellee sued in damages for the profits which he claimed he would have realized had he been allowed to proceed with the construction of the incinerator in accordance with the terms of the contract upon which he relies. The case was tried before a jury which found in favor of the appellee, and judgment was, accordingly, entered, from which this appeal is taken. Appellant contends that there was no evidence to sustain the verdict of the jury, and that the trial court, therefore, erred in not directing a verdict of no cause of action on appellant's motion, and in not sustaining, after the trial, a motion to enter judgment notwithstanding the verdict.

Was there sufficient evidence of a contract between the parties to sustain the verdict of the jury? That is the chief issue in the case.

In considering the claims of error, we are required briefly to review the testimony, especially with respect to what took place on February 24, 1945, the date on which appellee claims the company orally accepted his offer. On that day, it is admitted that Edellstein, the Assistant Purchasing Agent of the company, called appellee by telephone. What they said to each other in that conversation is the determining factor in this case.

Appellee testified that Edellstein told him that the Willys-Overland Company accepted his offer to build the incinerator; that he also told appellee that the company was much in need of the incinerator and "to get busy on it right away"; that he mentioned there was the question of government priorities—that is, an award, during wartime, by the government, allotting materials for construction, necessary to the welfare or safety of the people; that the procurement of such an allotment by the government was necessary, but would be taken care of within a

week or ten days by Willys-Overland, who retained a representative in Washington for that special purpose. Appellee further testified that Edellstein stated that there were, however, certain matters in connection with the project that appellee could "go ahead with and start performing so that when (the priority allotment) does come through, it will be that far advanced along." During their telephone conversation, appellee says that Edellstein "was checking over as he talked to me and he noticed that there were no terms in this proposition—this proposal." It is understood by both parties to the suit that the word, "terms," as used throughout the proceedings by the witnesses, means the amounts to be paid and the times of payment on the contract, as the construction work progressed. There was no misunderstanding as to the total sum to be paid, namely, $20,900. Edellstein, according to appellee, said that his only interest was to see that Willys-Overland was protected, and, in reply to this statement, appellee says that he informed Edellstein: "I told him I would be willing to do the job and they could pay for it when the job is accepted and completed. He said: 'No, that is not necessary.' He told me that anything that is fair would be agreeable to him."

It appears that it is customary with the Willys-Overland Company that when a purchase or contract is made by the Purchasing Department, at least of material required by the Engineering Department, a copy of the vendor's proposal, together with the requisition for material, is sent by the Engineering Department to the Purchasing Department with a purchase order, and that such requisition and purchase order bear a number assigned to that particular purchase or contract. The vendor customarily receives from Willys-Overland a copy of the purchase order, which corresponds to a written acceptance of his offer. Appellee understood this customary procedure, but did not receive such a written purchase order. He stated that Edellstein told him that if it were not for the priority feature, appellee "would receive the order by mail Monday." Edellstein, however, gave appellee the order number on the job, and appel-

lee testified that he said: "Krenz, I am giving you the order number. Here it is. We want some action on it."

Substantially all of the foregoing testimony of appellee is supported by the testimony of Nellie Waterhouse, who had an apartment in the same building in which appellee's office was located, and who had an arrangement with him to take telephone messages for him. She made notes (which were produced at the trial) while she listened to the telephone conversation between Edellstein and appellee, as to the acceptance of appellee's offer, the amount of the bid, the order number for the job which was given by Edellstein, and his instruction to proceed with the work at once. As soon as the telephone conversation was terminated, Miss Waterhouse came downstairs to appellee's office and congratulated him upon securing the order.

With regard to the "terms" of payment, appellee stated that Edellstein said that it was customary to have such terms in the offer, but that he would concede a point, due to the fact that the company needed the incinerator in such a hurry, and that he would provide for such terms by a supplement. Appellee testified that when he said he would be willing to do the job and await payment until after it was accepted, and was told that that would not be necessary, Edellstein asked him to send him a letter about terms so that he would have something in his records, and that appellee immediately wrote and mailed such a letter on the same day as the telephone conversation, in which he set forth the following:

"Gentlemen: In accordance with our telephone conversation of today, we suggest that the following terms be incorporated in your Purchase Order No. 46259. $7,000.00 payable on completion of 50% of contract. $7,000.00 payable on completion of 80% of contract. The balance to be paid when incinerator is completed and accepted by your company. Thanking you for your order and trusting the above terms will be acceptable to you, we are, Yours very truly, Thur-O-Burn Incinerator Company, by William Krenz."

Appellee testified that a few days after he sent the letter, Edellstein called him and told him that the terms outlined in the letter were satisfactory.

At the conclusion of the original telephone conversation of February 24, 1945, appellee says that Edellstein asked how soon he was going to get started on the job, and that appellee told him he would commence immediately. And appellee did start at once.

Right after the telephone conversation, appellee called on a subcontractor and, on the same day, entered into an agreement for the construction of all the brick and cement work on the incinerator project for the sum of $10,500. The subcontractor, at once, placed an order for three carloads of fire brick for the job in question. On the same day, the Priorities Division of the Engineering Department of appellant company called appellee by telephone asking him to submit a list of priority materials required by him for the job; and appellee typed out such a list and forthwith delivered it personally to the proper officials of the company. He also took a subcontractor out with him to the company's premises, and was shown by those in charge where the incinerator was to be built. At the same time, appellee and the subcontractor were given passes and badges to enter and go freely about the plant. While they were there, they made arrangements with the engineering officials for the necessary trackage to bring in the several carloads of material, necessary for the construction work. The company engineers also discussed with appellee's subcontractor what adjustment he could make in the building of the incinerator to avoid interfering with a shell conveyor which was to operate above one end of the proposed incinerator. Appellee, in preparing to carry out his claimed agreement, further went to the Toledo Foundry Company and removed his pattern equipment for manufacturing the iron doors and gratings which he kept stored there. He then called upon the Toledo Stove and Range Company, advised the general manager of that concern that he had received the order for building the Willys-Overland incinerator, and gave the stove company a verbal order for the casting of the iron doors and gratings for the job.

About the first of March, 1945, representatives of Dun & Bradstreet, a credit rating agency, called on appellee. They had been employed by Willys-Overland to inquire as to his credit and secure a financial report on him. On March 3, 1945, Edellstein called appellee by telephone and informed him that he was cancelling the order. Appellee testified that he asked the reasons for this action and that Edellstein refused to give any. Assuming from the calls upon him by Dun & Bradstreet, that it was because of the credit rating they had given him, appellee, on the same day, Saturday, that he had received notification of the cancellation, wrote Edellstein a letter in which he stated:

"In order that you may be assured of our reliability in consummating the incinerator contract, we will be glad to furnish, upon your request, a Surety Bond in an amount to cover the contract price according to the terms mentioned in our letter of February 24th.

"Or, if you prefer, we will submit our invoice together with sub-contractor's and material suppliers' waivers of lien when contract is completed to your satisfaction.

"We wish to mention at this time that Mr. A. F. Johnson who resides at 2978 Densmore Drive, Toledo, is actively associated with us. Mr. Johnson not only aids us in the financing of our contracts but also superintends the construction of our incinerators. We refer you to Dun & Bradstreet's for Mr. Johnson's financial status.

"Yours very truly,
"Thur-O-Burn Incinerator Company
"Wm. Krenz"

On the following Monday, appellee called Edellstein by telephone, but was told by him that nothing could be done and that the whole matter had been returned to the Engineering Department and was out of his hands. Appellee then commenced to call the officials of the company to tell his side of the story, and got in touch with the Treasurer, Hopkinson, who referred him to his assistant, Heinrich. Arrangements were made at once for an interview with the Purchasing Department officials for the next day, and at that time, there were present Bancroft, the General Purchasing Agent; Edellstein, the Assistant General Purchasing Agent; Heinrich, Assistant to the Treasurer; and the appellee and his associate, Johnson. Nothing was mentioned about the "terms" of the contract at this meeting. They had before them only the reports of appellee's company and Johnson's financial report. Heinrich, after examining the reports, said that if Johnson was "willing to go along with Mr. Krenz and back this job, and is associated with him, I see no reason why we should not continue." Bankcroft then jumped up and said he would not consider a "three cornered deal." That ended the conference. The record is not clear whether the job was immediately given to some other contractor or had already been awarded to someone else at the time of the conference. Edellstein stated that "the pressure was so great upon us we automatically placed the contract elsewhere."

The evidence on the part of appellant company consists largely of the testimony of Edellstein who denied stating to appellee that the company accepted his offer, but admitted that the company offered to place the business with him, "contingent on terms." There is no dispute as to the agreement of the parties on any of the provisions of the contract, including the total amount of $20,900 for the job. Edellstein says that his proposal to appellee was to pay $10,450 upon 50% completion and the balance of $10,450 upon final completion; but that appellee insisted upon $7,000 on completion of 50% of the contract; $7,000 on completion of 80% of the contract; and the balance upon completion and acceptance of the job. This would seem to be an inconsiderable difference between the parties. Appellee swore that no terms of any kind were ever suggested to him by Edellstein. In view of all of the circumstances in this case, including appellee's letter of March 3 expressing his willingness to furnish a surety bond for the completion of the work, or to await completion of the job and submission by him of waivers of lien on the part of all subcontractors, before receiving payment, it is impossible to believe that appellee objected to any terms proposed by the company, or that any such terms were ever suggested. And this conclusion is further borne out by

testimony of Edellstein himself. On direct examination by his own counsel, or rather counsel for Willys-Overland, when he was asked about the original conversation, and he began to testify about his mentioning to appellee that the offer did not contain terms, he testified that appellee "said that any terms that would be satisfactory to us, would be satisfactory to him." His later contradictions do not derogate from the force of this statement, which is exactly what appellee claimed that he said.

■ The contentions of the company that there was no contract between the parties because appellee refused to agree upon "terms" of payment, and that this was the reason for giving the contract to someone else, are not, in the least, plausible. The question of whether there was an agreement between the parties was a question of fact for the jury. There is no merit to the claim that slight or apparent inconsistencies of language in appellee's testimony entitled appellant to a directed verdict. Not only was there substantial evidence to support the verdict of the jury, but, in our opinion, it was sustained by the overwhelming evidence in the case.

■ One further point remains for determination. Appellant contends that the trial court erroneously excluded from evidence a letter written by appellee two months after he was informed that he could not proceed with the contract. The letter lists "services rendered to date in connection with the incinerator project," and states: "We feel we are entitled to a payment of $3,135 at this time for our services. The amount is 15% of our quotation of $20,900—our proposal of February 6, 1945." The letter then goes on to state that the proposal was accepted by Edellstein and details services preformed from January 25, 1943 to February 6, 1945. It concludes with the statement that Edellstein had advised appellee that the company had accepted his proposal of February 6, 1945. On objection to the admission of the letter in evidence, the trial judge stated that he thought that it might be construed as an offer of settlement and that they had better stay away from that subject. Counsel for appellant asked if he might offer the letter and have

it rejected, and was told he might offer it. He then asked the witness what the letter was and was answered that it was a letter dated May 5, 1945, sent by appellee to Willys-Overland, and that appellee had signed it and mailed it. No other offer in evidence was made, or ruling had, on the letter. Without regard to this latter consideration, we are of the opinion that the letter was inadmissible in evidence. It might well appear as an offer of settlement —if it were not regarded as an outright demand for a payment on account, of 15% of the original proposal, "at this time," as the letter emphasized. Moreover, counsel for appellant had previously objected to the introduction of any evidence of such expenses for services prior to February 24, 1945. Obviously, in a suit on the contract in question, any claim for such services was irrelevant. Nor could the letter be reasonably considered as an admission of any nature as it stated in two different places, and continued to rely on the fact, that appellee's offer had been accepted by the company. The trial court correctly held that the letter was inadmissible.

In accordance with the foregoing, the judgment of the district court, entered upon the verdict of the jury, is affirmed.